# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00318-CV

**Texas Health and Human Services Commission and Thomas Suehs, Commissioner, Appellants**

**v.**

**El Paso County Hospital District d/b/a R. E. Thomason General Hospital, et al., Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT NO. D-1-GN-02-003154, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

## O P I N I O N

Beginning in 2001, fourteen Texas hospitals (the Hospitals)[1] initiated proceedings—first at the agency level, then in the courts—challenging the methodology used by the Health and Human Services Commission (HHSC) in determining the rates under which the agency reimburses Texas hospitals for inpatient services provided to Medicaid insureds. Though unsuccessful before the agency and the lower courts, the Hospitals ultimately prevailed in

---

[1] In addition to the El Paso County Hospital District d/b/a R. E. Thomason General Hospital, these include Conroe Hospital Corporation d/b/a Conroe Regional Medical Center; Bay Area Healthcare Group, Ltd. d/b/a Corpus Christi Medical Center; Sunbelt Regional Medical Center, Inc. d/b/a East Houston Regional Center; Brownsville-Valley Regional Medical Center d/b/a Valley Regional Medical Center; Columbia/St. David's Healthcare System, L.P. d/b/a North Austin Medical Center; El Paso Healthcare System, Ltd. d/b/a Las Palmas Medical Center and Del Sol Medical Center; HCA Health Services of Texas, Inc. d/b/a Rio Grande Regional Hospital; Methodist Healthcare System of San Antonio, Ltd. d/b/a Methodist Specialty & Transplant Hospital, Northeast Methodist Hospital, and Southwest Texas Methodist Hospital; and St. David's Medical Center and Round Rock Medical Center.

the Texas Supreme Court. *See El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709 (Tex. 2008) (the "first appeal"). In a 2008 opinion and judgment, the supreme court declared invalid part of HHSC's rate-setting methodology, enjoined its enforcement, and declared that the Hospitals were entitled under HHSC's rules to a contested-case hearing regarding the agency's calculation of the reimbursement rates. *See id.* at 714-16. It remanded the cause to the district court for further proceedings consistent with its opinion.

Meanwhile, during the intervening years, HHSC had implemented Medicaid reimbursement rates derived from the methodology the supreme court later held invalid and paid the Hospitals' Medicaid reimbursement claims in accordance with those rates. On remand, the Hospitals sought remedies that had the ultimate goal of recovering any "underpayments" of Medicaid reimbursement caused by HHSC's application of the now-invalidated rate methodology. At the Hospitals' urging, the district court rendered a judgment that granted injunctive relief contemplating that HHSC would recalculate, without applying the invalidated part of its rate methodology, the reimbursement rates that would have applied beginning in state fiscal year 2002 and each year thereafter. On appeal, HHSC challenges this injunctive relief to the extent it applies to time periods before the date of the supreme court's mandate.

As we detail below, the parties' contentions require us to ascertain the legal effect of the supreme court's judgment, whether the district court awarded relief beyond what the supreme court did explicitly or implicitly, and whether any such additional relief was error. We conclude that to the extent the district court's injunction applies to the calculation of the reimbursement rates applicable during state fiscal year 2008 or later, the relief merely tracks the

2

legal effect of the supreme court's judgment. However, to the extent the injunction extends to recalculations of the rates that applied during prior years, we conclude that it goes beyond the relief awarded in the supreme court's judgment and, furthermore, was error.

## BACKGROUND

**Rate-setting methodology**

The Medicaid health insurance program, which covers medical care for low-income and certain other eligible persons, is jointly operated and funded by the federal and state governments, with each state being responsible for administering the program within its borders in accordance with guidelines mandated or approved by the federal government. *See id.* at 711-12. In Texas, the Legislature has delegated this administrative responsibility to HHSC. A key part of HHSC's delegated responsibilities is reimbursing health care providers who provide medical care to Medicaid insureds and determining the amounts to be paid. At relevant times, the Legislature had charged HHSC with establishing, "on a prospective payment basis," the amounts that Texas hospitals are reimbursed for providing inpatient services to Medicaid patients.[2] Tex. Hum. Res. Code Ann. § 32.028(d)(1) (West Supp. 2010).[3] In so doing, the Legislature has required that HHSC "shall,"

---

[2] *See El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 712 (Tex. 2008) (observing that this "prospective-payment system" enables "hospitals to know the rate at which they will be reimbursed for specific services," creating incentives for them "to control costs . . . so they can earn a profit under the pre-determined rates"); *cf. El Paso County Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 161 S.W.3d 587, 589 n.1 (Tex. App.—Austin 2005), *rev'd*, 247 S.W.3d 709 (Tex. 2008) (observing that Texas had previously utilized a retrospective system in which reimbursement was based on the actual costs incurred in providing the medical services).

[3] Except where there has been a material intervening substantive change, we cite the current versions of relevant statutes for convenience.

3

among other things, "assure that the payment rates are reasonable and adequate to meet the costs incurred by the hospital in rendering services to Medicaid recipients." *Id.* To that end, HHSC has promulgated rules establishing procedures whereby it is to periodically recalculate prospective reimbursement rates for Medicaid inpatient hospital services based on recent historical claim and cost information collected from hospitals. Although these rate-setting procedures were described at length in the opinions from the first appeal,[4] their complexity and the parties' common reliance on their intricacies in the present appeal warrant that we revisit them in some detail to provide context and clarity to the issues currently in dispute.

Since 1986, and at all times relevant to this appeal, the agency has had in effect formal rules governing how it establishes and adjusts Medicaid reimbursement rates for hospitals. *See* 1 Tex. Admin. Code § 355.8063 (2004) (Tex. Health & Human Servs. Comm'n, Reimbursement Methodology for Inpatient Hospital Services) (hereinafter, "Former Rule § 355.8063"). Although there were other components to the rates HHSC set under Former Rule § 355.8063, the one important to this appeal was a "standard dollar amount" (SDA) assigned to each hospital, an approximation of the hospital's costs for an average or "standard" Medicaid case. *See id.* § 355.8063(a), (b)(4), (c). HHSC would first determine each hospital's individual SDA by dividing the hospital's overall cost per Medicaid case by a factor known as the "case mix index," a measure of the average complexity of the hospital's Medicaid cases. *See id.* § 355.8063(b)(2)-(4), (c). Based on their individual SDAs, hospitals were then grouped into "payment divisions," and a weighted-

---

[4] *See El Paso Hosp. Dist.*, 247 S.W.3d at 711-13; *El Paso County Hosp. Dist.*, 161 S.W.3d at 589-90.

average SDA was determined for each such division. *See id.* § 355.8063(a), (b)(4). The weighted-average SDA was then assigned to each hospital in the payment division. *See id.* From there, the amount of Medicaid reimbursement paid to a hospital for providing a particular medical treatment or procedure would be determined by multiplying the weighted-average SDA assigned to the hospitals' payment division times a "relative weight" reflecting the complexity of the procedure.[5] Although the actual calculations were somewhat more complicated, for present purposes it suffices to observe that a higher individual SDA for a hospital could mean a higher payment division and higher assigned weighted-average SDA, and that the higher a hospital's assigned weighted-average SDA, the greater its reimbursement payments for providing a particular medical treatment. Consequently, we will use reimbursement "rates" as shorthand for the weighted-average SDA assigned to a hospital based on its payment division, and "SDAs" to refer to the individual SDAs that determined a hospital's assigned payment division.

Under Former Rule § 355.8063, HHSC was generally required to recalculate or "rebase" SDAs and reimbursement rates and recalibrate relative weights at least every three years. *See id.* § 355.8063(h), (i). This rebasing process correspondingly ran on a three-year cycle that was tied to the state fiscal year (FY), which runs from September 1 through August 31. *See El Paso Hosp. Dist.*, 247 S.W.3d at 713. The first year of the three-year cycle was designated as the "base year," a "12-consecutive month period of claims data selected by [HHSC] or its designee."

---

[5] Medical treatments and procedures were classified into "diagnostic-related groups" (DRGs). *See* Former Rule § 355.8063(b)(1), (e). For each DRG classification, a relative weight was determined by dividing the statewide average cost of that treatment by the statewide average cost for all cases. *See id.* § 355.8063(a), (b)(3), (c), (e).

5

Former Rule § 355.8063(b)(5); *see El Paso Hosp. Dist.*, 247 S.W.3d at 712. Following the end of the base year (FY 1), HHSC would, during the second year (FY 2), compile cost data from Medicaid claims arising from hospital admissions made during FY 1 and, based on this data, determine new SDAs, reimbursement rates, and relative weights. *See* Former Rule § 355.8063(n); *El Paso Hosp. Dist.*, 247 S.W.3d at 712. These new rates would then take effect at the beginning of the third year (September 1 of FY 3) and remain effective for another three-year period, during which the same rebasing process would be repeated based, once again, on claims data compiled from the first year of the period. *See* Former Rule § 355.8063(n); *El Paso Hosp. Dist.*, 247 S.W.3d at 712. In the interim between rebasings, HHSC was to make annual cost-of-living adjustments to the rates. *See* Former Rule § 355.8063(n)(2).

Hospitals had an obvious stake in ensuring that HHSC fully accounted for their costs of treating Medicaid patients during the base year, as higher costs could mean higher SDAs, higher reimbursement rates, and greater reimbursement payments. Former Rule § 355.8063 provided hospitals an administrative appeal process through which they could challenge perceived "mechanical, mathematical, and data entry errors in computing the hospital's base year claims data" and obtain adjustments before the new rates became effective. *See id.* § 355.8063(k). However, the rule explicitly barred such appeals with respect to "the prospective payment methodology used by the HHSC," including "the payment division methodologies." *Id.* § 355.8063(k)(2).

Under this administrative appeal process (hereinafter "the appeal rule"), a hospital claiming that HHSC made "a mechanical, mathematical, and data entry error in computing the hospital's base year claims data" could submit to HHSC, within sixty days after the hospital received

6

initial notification of its SDA and payment division (which would occur during the second year of the three-year rebasing process), "a specific written request for review and appropriate specific documentation supporting its contention that there has been [such] error." *Id.* § 355.8063(k)(1)(A). HHSC then had to "conduct the review as quickly as possible and notify the hospital of the results." *Id.*; *see El Paso Hosp. Dist.*, 247 S.W.3d at 715 (observing that HHSC termed this procedure an "informal review"). "If the hospital [was] dissatisfied with the results of the review," the appeal rule further provided, "the hospital [could] request a formal hearing" before the State Office of Administrative Hearings (SOAH) under the contested-case procedures of the Administrative Procedure Act (APA). Former Rule § 355.8063(k)(1)(A); *see El Paso Hosp. Dist.*, 247 S.W.3d at 715.

The appeal rule further required that if the "review or appeal" ultimately determined that an adjustment to the hospital's SDA or payment division was warranted, the timing of that adjustment would depend on when that review or appeal was completed:

> if the review or appeal is completed at least 60 days before the beginning of the next prospective year, any adjustment required after completion of the review or appeal is applied to that next prospective year. If the review or appeal is not completed at least 60 days before the beginning of the next prospective year, any adjustment required after the completion of the review or appeal is applied only to the subsequent prospective year. The base year claims data used by the HHSC . . . pending the review or appeal is the base year claims data established by the HHSC . . . .

Former Rule § 355.8063(k)(1)(A). In context, "the beginning of the next prospective year" referred to September 1, the first day of the ensuing state fiscal year. The sixtieth day prior to that date is July 3. Thus, the appeal rule contemplated that if the "review or appeal" had not concluded by July 3

7

of the second year of the three-year rebasing cycle, the new SDAs and reimbursement rates—although derived from base-year claims data that was still in dispute as of that deadline—would nonetheless take effect on the following September 1 as scheduled, pending the outcome of the "review or appeal." If the "review or appeal" later determined that adjustments were required, those adjustments would be "applied only to the subsequent prospective year."

In addition to the appeal rule, Former Rule § 355.8063 also provided for correction of certain errors in reimbursement rates that had already been implemented—and, within certain limitations, for reconciliation of the reimbursement amounts HHSC had paid a hospital under the rates prior to correction with the amounts to which the hospital would be entitled under the rates as corrected (hereinafter "the error-correction rule"). The error-correction rule provided that "[w]hen the HHSC or its designee determines that [it] has made an error that, if corrected, would result in the [SDA] of the provider for which the error was made changing to a new payment division, either higher or lower"—i.e., yielding a different applicable reimbursement rate—"the HHSC or its designee moves the provider into the correct payment division [and] reprocesses claims paid using the initial, incorrect [SDA] that was in effect before the current state fiscal year by using the existing [SDA] in which the provider was moved." *Id.* § 355.8063(c).[6] However, the error-correction rule emphasized that "[t]he correction of this error condition only applies to the current state fiscal year payments," and "[n]o corrections are made to payment rates for services provided in previous state fiscal years." *Id.*

_____

[6] These calculations were to utilize "the relative weights that are currently in effect for the state fiscal year." Former Rule § 355.8063(c).

8

**The dispute and first appeal**

The underlying dispute originated from HHSC's rebasing of hospital SDAs and reimbursement rates during a three-year cycle beginning September 1, 1999 (i.e., from a base year of FY 2000), to take effect on September 1, 2001 (FY 2002). When compiling the Hospitals' base-year FY 2000 claims data during FY 2001, HHSC followed a practice—purportedly dating back to the 1986 origins of Former Rule § 355.8063, but appearing nowhere in the rule's text—of including information from Medicaid claims from base-year Medicaid admissions only if the claims were processed and paid by not later than six months following the end of the base year (here, February 28, 2001, the end of the sixth month after FY 2000 ended on August 31, 2000). The Hospitals complained that HHSC's application of this "February 28 cutoff" had unlawfully excluded legitimate Medicaid reimbursement claims from their respective base-year claims data ("post-February 28 claims data") and skewed their SDAs and rates downward by disproportionately excluding complex, high-cost claims that tended to take longer to process and pay. HHSC insisted that its application of this deadline was a permissible interpretation of Former Rule § 355.8063 and one warranted by the necessity of having to close the base-year data set sufficiently far in advance of September 1 to allow time for it to compile the claims data, calculate the hospitals' SDAs, and implement the new reimbursement rates by that date.

The Hospitals each requested informal administrative review under HHSC's appeal rule, asserting that the agency's exclusion of their post-February 28 claims data constituted "data entry" or "mechanical" errors. *See El Paso Hosp. Dist.*, 247 S.W.3d at 715-16. HHSC denied the requests, in the view that the Hospitals were raising complaints about its rate-calculation

methodology and, thus, had no right of appeal under the rule. *See id.* at 713. The Hospitals then requested HHSC to refer their complaints to SOAH for contested-case hearings, but HHSC—again in the view that the Hospitals' complaints concerned rate-calculation methodology—declined to refer them. *See id.* It is undisputed that the Legislature has provided no right of judicial review from HHSC's refusal to make the referrals. *See, e.g.*, *Continental Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 397 (Tex. 2000) ("It is well recognized under Texas law that there is no right to judicial review of an administrative order unless a statute provides a right or unless the order adversely affects a vested property right or otherwise violates a constitutional right.") (citing *Stone v. Texas Liquor Control Bd.*, 417 S.W.2d 385, 385-86 (Tex. 1967)); *Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 515 (Tex. App.—Austin 2010, no pet.) (additionally observing that sovereign immunity generally bars declaratory claims that would disturb a non-appealable agency order).

The new SDAs and reimbursement rates—again, derived from a FY 2000 base-year data set that excluded the Hospitals' post-February 28 claims data—took effect as scheduled on September 1, 2001. In August 2002, the Hospitals sued HHSC[7] in an attempt to challenge both the agency's application of the February 28 cutoff in calculating their reimbursement rates and its refusal to refer their administrative appeals to SOAH. As they ultimately amended their pleadings, the Hospitals invoked the cause of action and waiver of sovereign immunity provided under

---

[7] The Hospitals also asserted their claims against HHSC's executive director, in his official capacity, but the distinction is immaterial at this juncture.

section 2001.038 of the APA[8] and sought declarations that: (1) "the February 28, 2001 claims processing deadline is invalid and void" because it constituted a "rule" that HHSC had adopted without complying with the APA's notice-and-comment rulemaking procedures,[9] (2) the cutoff was in "direct conflict" with the substantive requirements of both Former Rule § 355.8063 and the human resources code; and (3) "HHSC has wrongfully denied the Hospitals' requests for administrative review provided in [Former Rule] § 355.8063(k)(1)(A)" and that "as a result of HHSC's wrongful denial . . . HHSC has impaired the Hospitals' legal rights and privileges by failing to correct mechanical and data entry errors in the calculation of the Medicaid base year claims for state fiscal years 2002, 2003 and 2004."[10] The Hospitals also requested temporary and permanent injunctive relief enjoining HHSC "from reimbursing the Hospitals in a manner that excludes all base year claims, regardless of whether the claims were processed before February 28, 2001."

The district court initially granted the Hospitals' request for a temporary injunction. However, in October 2003, following a bench trial, a visiting judge rendered judgment that the Hospitals take nothing on their claims. The Hospitals appealed to this Court, asserting that: (1) the

---

[8] *See* Tex. Gov't Code Ann. § 2001.038(a) (West 2008) (providing that "[t]he validity or applicability of a rule . . . may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff"); *Texas Logos, L.P. v. Texas Dep't of Transp.*, 241 S.W.3d 105, 123 (Tex. App.—Austin 2007, no pet.) ("section 2001.038 is a grant of original jurisdiction and, moreover, waives sovereign immunity").

[9] *See* Tex. Gov't Code Ann. §§ 2001.003(6), .023-33, .035 (West 2008).

[10] The Hospitals' live pleadings also invoked the Uniform Declaratory Judgments Act. HHSC asserts, and the Hospitals do not dispute, that the Hospitals' claims under the UDJA either sound exclusively under APA 2001.038 or that the Hospitals waived any UDJA claims by relying exclusively on section 2001.038 during the first appeal. *See El Paso Hosp. Dist.*, 247 S.W.3d at 715 (describing the Hospitals' claims solely as APA section 2001.038 declaratory claims).

11

February 28 cutoff was invalid because it constituted an invalidly promulgated "rule" under the APA and was also substantively invalid because it conflicted with Former Rule § 355.8063 and the human resources code; and (2) HHSC had misapplied its appeal rule in denying them a SOAH hearing. *El Paso County Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 161 S.W.3d 587, 590, 594 (Tex. App.—Austin 2005), *rev'd*, 247 S.W.3d 709 (Tex. 2008); *see* Tex. Gov't Code Ann. § 2001.003(6); .035 (West 2008); Tex. Hum. Res. Code Ann. § 32.028(d)(1); Former Rule § 355.8063(k)(1)(A). This Court overruled both issues and affirmed the district court's judgment, reasoning in part that (1) the February 28 cutoff was not a "rule" under the APA and that (2) the Hospitals' administrative appeals were unreviewable complaints about HHSC's payment methodology. *El Paso County Hosp. Dist.*, 161 S.W.3d at 594.

The Hospitals then appealed to the Texas Supreme Court, which granted review.

**Texas Supreme Court proceedings**

The supreme court initially issued an opinion and judgment affirming this Court's judgment in part, reversing in part, and remanding to HHSC. *El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, No. 05-0372, 2007 Tex. LEXIS 740, at *16 (Tex. Aug. 31, 2007). On rehearing, however, the court withdrew its original opinion and issued a substituted opinion and judgment reversing this Court's judgment in full, rendering judgment in part, and remanding to the district court in part. *El Paso Hosp. Dist.*, 247 S.W.3d at 716. Because the supreme court's modifications to its opinion and judgment on rehearing and the parties' arguments that preceded them prove to be relevant to our analysis, we describe them in some detail.

12

In both of its opinions, the supreme court, agreeing with the Hospitals, held that the February 28 cutoff was an invalidly promulgated rule under the APA. *See El Paso Hosp. Dist.*, 247 S.W.3d at 714-15; *El Paso Hosp. Dist.*, 2007 Tex. LEXIS 740, at \*14. The court expressly did not reach whether the cutoff was also substantively invalid, leaving that matter to HHSC to "explore as a part of the rule-making process" the agency would presumably initiate to enact the cutoff in the form of an APA-compliant rule. *See El Paso Hosp. Dist.*, 247 S.W.3d at 714-15; *El Paso Hosp. Dist.*, 2007 Tex. LEXIS 740, at \*13.

In its initial opinion, the supreme court, relying on section 2001.040 of the APA,[11] and "[f]inding no good reason to invalidate the rule immediately," opted to leave the February 28 cutoff in effect and remanded the matter to HHSC to afford the agency a "'reasonable time . . . to either revise or readopt the rule through the established procedures.'" *El Paso Hosp. Dist.*, 2007 Tex. LEXIS 740, at \*14 (quoting Tex. Gov't Code Ann. § 2001.040 (West 2008)). It then affirmed this Court's judgment regarding the Hospitals' administrative appeals, reasoning that "because the Hospitals' argument . . . essentially seeks a formal review of HHSC's methodology," the agency could have properly denied their hearing requests. *El Paso Hosp. Dist.*, 2007 Tex. LEXIS 740, at \*16.

---

[11] *See* Tex. Gov't Code Ann. § 2001.040 (West 2008) ("If a court finds that an agency has not substantially complied with one or more procedural requirements of Sections 2001.0225 through 2001.034, the court may remand the rule, or a portion of the rule, to the agency and, if it does so remand, shall provide a reasonable time for the agency to either revise or readopt the rule through established procedure. During the remand period, the rule shall remain effective unless the court finds good cause to invalidate the rule or a portion of the rule, effective as of the date of the court's order").

The Hospitals filed a motion for rehearing pointing out that APA section 2001.040 did not apply to the case because that statute had been added in 1999, the Legislature had provided that it would apply only prospectively, and the February 28 cutoff dated back to 1986. In response, HHSC conceded that section 2001.040 did not apply because the February 28 cutoff predated the statute's enactment. The parties also agreed in principle that, under the pre-1999 version of the APA, the supreme court did not have discretion to leave the February 28 cutoff in effect. Beyond this, however, the parties skirmished regarding the details of the appropriate appellate remedy and—foreshadowing the issues in the present appeal—the implications of that remedy for the Hospitals' Medicaid reimbursement claims that HHSC had already paid under the rates it had derived from base-year data to which the February 28 cutoff had been applied.

During the pendency of the litigation, HHSC had continued to pay Medicaid reimbursement to the Hospitals in accordance with rates that had been derived from FY 2000 base-year claims data to which the February 28 cutoff had been applied (i.e., that had excluded the post-February 28 claims data). Following their implementation, the original FY 2002 rates had been adjusted for cost-of-living increases in FY 2003 and 2004. Effective in FY 2005, HHSC had implemented rates apparently derived from an adjusted version of the original FY 2000 base-year data—still excluding the post-February 28 claims data. Thereafter, the reimbursement rates had remained unchanged. Consequently, by the time the supreme court issued its substituted opinion on rehearing in 2008, almost six years had elapsed in which HHSC had paid the Hospitals Medicaid reimbursement in accordance with rates calculated under a February 28 cutoff "rule" that

14

the supreme court ultimately held to violate the APA—and which, according to the Hospitals, had caused "underpayments" to them.

The Hospitals argued that the proper remedy under the applicable, pre-1999 version of the APA was to "declare the February 28 cutoff void and enjoin its enforcement." They further asserted that this remedy was "critically important to the Hospitals" because, they reasoned, "it would (1) result in *retroactive* invalidation of the February 28 cutoff, and (2) pave the way for the Hospitals to seek retroactive adjustment of their prospective reimbursement rates set in the 2000 base year, which were improperly skewed downward as a result of HHSC's application of the February 28 cutoff." (Emphasis in original.) In support of these propositions, the Hospitals relied on the concept that when a court declares an agency rule invalid, the governing legal standard reverts to the last validly adopted one in effect prior to the rule's promulgation. *See All Saints Health Sys. v. Texas Workers' Comp. Comm'n*, 125 S.W.3d 96, 103 (Tex. App.—Austin 2003, pet. denied). As applied to the invalidation of the February 28 cutoff, the Hospitals urged that this principle meant that the existing reimbursement rates dating back to FY 2002—the first year for which they had complained of the rate calculation—were void and would have to be recalculated under the correct legal standards (i.e., without application of the February 28 cutoff).

Assuming that the supreme court agreed with them and declared the February 28 cutoff immediately "void," the Hospitals additionally urged the court to revisit its disposition of the administrative-appeal issue and conclude that, with no February 28 cutoff in effect, their complaints regarding exclusion of the post-February 28 claims data went to "data entry" rather than "methodology," and should be referred for formal hearing. The Hospitals further suggested that their

15

administrative appeals would be "the most appropriate and efficient vehicle for [them] to seek retroactive adjustment of their reimbursement rates."

HHSC agreed with the Hospitals only to the extent of conceding that the court should declare the February 28 immediately "invalid," although it pointedly did not refer to this disposition as rendering the cutoff "void," as the Hospitals did. As for the Hospitals' assertions regarding retroactive effects of such a judgment, HHSC urged that this "proposed justification for the Hospitals' requested relief is immaterial to the Court's analysis" and was not before the court because the Hospitals had previously disclaimed seeking any remedy other than prospective relief. Nonetheless, HHSC also joined issue with the Hospitals' assertions regarding retroactive effects, arguing that such relief was unavailable because its orders in the Hospitals' administrative appeals were long since final, there remained "no pending administrative proceeding in which their 2001-2007 rates are still at issue," and the Hospitals' declaratory claims under APA section 2001.038 could not be used to collaterally attack or reopen the final administrative orders. Similarly, HHSC urged the supreme court not to revisit its holding regarding the administrative appeals because "the Hospitals cannot use the cutoff date's invalidation in the collateral [section 2001.038] suit to undo HHSC's final orders," such that the Hospitals' declaratory claims regarding the "data-entry" versus "methodology" distinction under the appeal rule were effectively moot. In the alternative, even if the Hospitals' section 2001.038 claims could somehow "revive" their administrative proceedings, HHSC emphasized that the appeal rule provided that any adjustments yielded by that process could take effect no earlier than the "next prospective year," or even not until the "subsequent prospective year." "Next prospective year" or "subsequent prospective year," HHSC reasoned, would necessarily

16

refer to a fiscal year after the Hospitals' administrative appeals, if reinstated, were finally concluded, not earlier years.

In a reply brief—within a section titled, "The Parties Agree That the Issue of Retroactive Relief is Not Before This Court and Should Not Be Addressed By This Court"—the Hospitals clarified that their previous arguments were intended merely to "demonstrat[e] that a judgment declaring the February 28 cutoff void would create an avenue for the Hospitals to seek retroactive relief in a future administrative or court proceeding" in order to "emphasize the importance of obtaining this relief." They insisted that they "did *not* ask the Court to decide the retroactivity issue," which "is properly reserved until such time as the Hospitals actually seek retroactive relief in a future proceeding." Nonetheless, responding to "retroactivity arguments" HHSC had raised, the Hospitals went on to reiterate their views regarding the legal effects of declaring the February 28 cutoff "void."

In its substituted opinion, the supreme court held that "[b]ecause we conclude that the February 28 cutoff is a rule that HHSC did not properly promulgate, we reverse the court of appeals' judgment and render judgment declaring the rule invalid and enjoining its enforcement." *El Paso Hosp. Dist.*, 247 S.W.3d at 715. Throughout its substituted opinion, the court used the term "invalid" to describe the legal status of the February 28 cutoff and did not use the term "void," as the Hospitals had argued. *See id.* at 711, 715-716. This phraseology tracks the version of APA section 2001.035 that governed the case, and the court cited that statute (albeit without specifying the year or version) as authority for its disposition of the issue. *See id.* at 715 ("*See* Tex. Gov't Code § 2001.035"). Although section 2001.035 currently provides that a rule is

17

"voidable" unless enacted in substantial compliance with the APA's requirements, *see* Tex. Gov't Code Ann. § 2001.035, the "voidable" language was added in 1999, in the same bill that added APA section 2001.040. Act of Sept. 1, 1999, 76th Leg., R.S., ch. 558, § 3, 1999 Tex. Gen. Laws 3089, 3090, *codified as amended*, Tex. Gov't Code Ann. § 2001.035. Prior to the 1999 amendment, section 2001.035 had stated that "[a] rule . . . is not valid" unless adopted in substantial compliance with the APA's procedures. *Id.*

As for the Hospitals' declaratory claims regarding HHSC's refusal to refer their administrative appeals for formal hearing, the supreme court tacitly rejected any notion that these claims were moot, rendering judgment declaring that "the Hospitals' administrative appeals . . . . involve[] a reviewable 'data entry' claim," such that "the Hospitals were entitled to a review of individual claims data excluded by the February 28 cutoff." *El Paso Hosp. Dist.*, 247 S.W.3d at 716.

In conclusion, the supreme court "reverse[d] the court of appeals' judgment and remand[ed] the case to the trial court for further proceedings." *Id.* The court's mandate subsequently issued on April 9, 2008. The mandate commanded the lower courts that "[t]he court of appeals' judgment is reversed and the cause is remanded to the trial court for further proceedings consistent with this Court's opinion."

**Events following mandate**

In the aftermath of the supreme court's April 2008 mandate, the parties joined issue at both the district court and agency levels as to the implications of the supreme court's judgment,

18

particularly with regard to reimbursement rates and payments from earlier years.[12]   In the district court, the Hospitals filed a motion for entry of judgment that sought, in part, to obtain relief making explicit that HHSC was required to recalculate the applicable reimbursement rates dating back to FY 2002.  Following a hearing, the district court signed a final judgment dated March 9, 2009.  The judgment recited that "[t]he Supreme Court specifically declared the 'February 28 cutoff' rule invalid and enjoined [HHSC] from reimbursing Plaintiffs for Medicaid inpatient services based on a Standard Dollar Amount reimbursement methodology that excludes claims based on the February 28 cutoff/deadline."  The judgment then provided:

- "The Final Judgment of this court, which was previously entered on October 4, 2003, is a nullity."

- "Plaintiffs are entitled to a review of individual claims data that Plaintiffs appealed and Defendants excluded, based on the February 28 cutoff/deadline, in accordance with the formal hearing rules found in Subchapter I, 1 TAC § 357.481, *et. seq.*, of HHSC's administrative rules." These citations referenced HHSC's then-current version of its rules governing formal hearings, which had been amended during the interim to designate the agency's Appeals Division rather than SOAH as the tribunal.

- "[HHSC is] enjoined from applying the February 28 cutoff/deadline on Plaintiffs' base year claims data used to calculate Plaintiffs' Medicaid Standard Dollar Amounts for state fiscal years 2002 through 2009, and until such time as [it] lawfully implement[s] a new rate."[13]

---

[12]  HHSC also promulgated an APA-compliant rule that incorporated the February 28 cutoff and initiated a rebasing under the new rule to calculate new prospective hospital reimbursement rates.  However, no new rates were implemented prior to the administrative order setting rates for FY 2010, discussed below.

[13]   The judgment also taxed costs in accordance with the supreme court's judgment and mandate.

After filing a motion for new trial that was overruled by operation of law, HHSC perfected this appeal.

Meanwhile, a few days after the district court signed its judgment, the Hospitals requested a formal hearing of their administrative appeals before HHSC's Appeals Division. The appeals were consolidated into a single proceeding, and an evidentiary hearing was eventually held in February 2010 before an ALJ, who signed a final agency order on June 9 of that year.[14] The evidence at the hearing reflected that HHSC had continued through the time of hearing to pay Medicaid reimbursement to the Hospitals under the same rates that it had originally implemented in FY 2005—again, still based on the FY 2000 data set to which the invalidated February 28 cutoff had been applied. However, following issuance of the supreme court's mandate, HHSC had recalculated for each Hospital the applicable SDA and reimbursement rates for FY 2010 (by the time of the hearing, the current state fiscal year) using a FY 2000 base-year data set that, per the judgments, incorporated the post-February 28 claims data. The parties stipulated to the accuracy of the calculations and that the calculations had yielded upward adjustments in the reimbursement rates for five of the hospitals.[15]

---

[14] We have granted the Hospitals' unopposed motion that we take judicial notice of this order, and the above summary is based on its contents.

[15] The reimbursement rates for the El Paso County Hospital District d/b/a R. E. Thomason General Hospital actually decreased, while those of the remaining eight hospitals did not change. R. E. Thomason subsequently withdrew from the administrative proceeding.

Neither side has suggested that the outcome of these administrative calculations or R. E. Thomason's withdrawal have mooted the present appeal with respect to any of these nine appellees, nor can we so conclude from our record. Although the calculations on which the FY 2010 adjustments were based would logically extend to the reimbursement rates applicable in FY 2005 through 2009 as well—the rates, again, were unchanged throughout that period—there has of yet

The ALJ found (with reference to the appeal rule) that "[t]he agency regulation controlling the calculation of Petitioners' Medicaid SDAs provides that the required adjustments are to be applied to the subsequent prospective year" and that (with reference to the error-correction rule) "HHSC has authority to issue corrected payments to Petitioner hospitals in accordance with the stipulated rates, retroactive to the [2010] state fiscal year beginning September 1, 2009." Reasoning that "prospective year" and "current year" under these rules meant the time of its June 2010 order, the ALJ concluded that it had no authority to order HHSC to pay reimbursement or additional reimbursement on claims arising prior to FY 2010. Similarly, the ALJ also excluded, as irrelevant and "outside the scope of the hearing," evidence that the Hospitals attempted to present regarding "the year-specific Medicaid SDA rates applicable to the Hospitals for state fiscal years 2002 through 2009 " and the differences between those rates and the reimbursements HHSC paid during the same time period. The net effect of the order, as the parties acknowledge, is that the applicable reimbursement rates for FY 2010 were recalculated and adjusted to account for the post-February 28 claims data, but that no similar recalculations were made with respect to FY 2002 through 2009.

**ANALYSIS**

The district court, on remand, had the mandatory, ministerial duty under the supreme court's mandate to give effect to the high court's judgment and to conduct any further

---

been no judicial or administrative determination of the rates that would have been applicable during FY 2002, 2003, or 2004. Consequently, each appellee Hospital would appear to have a continuing justiciable interest in this appeal at least with regard to FY 2002 through 2004, as the Hospitals' allegation that HHSC's use of the February 28 cutoff skewed each of their reimbursement rates downward remains pending and unrefuted with respect to those years.

21

proceedings necessary to dispose of the cause in a manner "consistent with this Court's opinion." *See Texas Dep't of Parks & Wildlife v. Dearing*, 240 S.W.3d 330, 347 (Tex. App.—Austin 2007, pet. denied); *see also Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986) ("in a subsequent appeal, instructions given to a trial court in the former appeal will be adhered to and enforced," and "courts should look not only to the mandate itself, but also to the opinion of the court," to ascertain what is being commanded by the mandate); *cf. Perry Nat'l Bank v. Eidson*, 340 S.W.2d 483, 487 n.2 (Tex. 1960) (when appellate court judgment refers to further proceedings consistent with that court's opinion, "[t]he nature of the judgment is therefore determined by an inspection of the opinion"). This included complying with the supreme court's partial rendition of judgment—which, in effect, became the district court's own judgment, *see* Tex. R. App. P. 65.2—"declaring the [February 28 cutoff] rule invalid and enjoining its enforcement," *El Paso Hosp. Dist.*, 247 S.W.3d at 715, and declaring "that the Hospitals' administrative appeals . . . . involve a reviewable 'data entry' claim" under the meaning of HHSC's appeal rule, such that "the Hospitals were entitled to a review of individual claims data excluded by the February 28 cutoff." *Id.* at 716. HHSC's arguments in its current appeal are predicated, in the first instance, on its perception of the issues that had already been decided by the supreme court—and, thus, are not susceptible to challenge in the lower courts on remand—versus the issues that had not been decided. It is helpful to start with an explanation of that view before turning to the agency's specific contentions on appeal, whose nature and scope are somewhat difficult to conceptualize in the abstract.

HHSC begins by arguing that the supreme court's injunction "enjoining . . . enforcement" of the February 28 cutoff operates only prospectively because injunctions always

operate prospectively unless the issuing court indicates otherwise, and that the supreme court did not indicate otherwise here. *See Democracy Coal. v. City of Austin*, 141 S.W.3d 282, 296 (Tex. App.—Austin 2004, no pet.) ("Generally, the purpose of injunctive relief is to halt wrongful acts that are threatened or in the course of accomplishment, rather than to grant relief against past actionable wrongs or to prevent the commission of wrongs not imminently threatened."). Moreover, HHSC observes that the supreme court's injunction became enforceable by the district court only upon issuance of the high court's April 2008 mandate. *See In re Long*, 984 S.W.2d 623, 626 (Tex. 1999) (per curiam) (absent contrary order by trial or appellate court, trial court could not hold a party in contempt for violating an injunction until all appeals relating to the judgment were exhausted and a mandate enforcing the injunction issued). Consequently, HHSC reasons, the district court's injunction would enforce or track the supreme court's injunction only to the extent it operated prospectively from the date of mandate.

HHSC additionally urges that the supreme court's injunction and declarations must be viewed in the procedural context of HHSC's appeal rule and error-correction rule, which were neither challenged by the Hospitals nor invalidated by the supreme court. Within that procedural framework, HHSC urges, the supreme court's declaratory and injunctive relief invalidating the February 28 cutoff and prospectively barring its enforcement operated merely to prohibit HHSC from using the cutoff (at least until it enacted the cutoff in the form of an APA-compliant rule) in any future administrative calculations or recalculations of reimbursement rates under the appeal rule or error-correction rule. For example, HHSC observes, the injunction would bar application of the February 28 cutoff in the "review of individual claims data" under its appeal rule to which the

23

supreme court declared that the Hospitals were entitled. But if that review or other administrative proceedings result in rate changes or adjustments, HHSC insists, both of these unchallenged rules require that such changes could have only prospective effect. Specifically, HHSC urges that the timing of any resulting rate changes or adjustments would be a function of (1) when the administrative process finally concludes (obviously sometime after the supreme court's mandate, and which ultimately did not occur here until June 2010), and (2) the requirements of the appeal rule—which makes any adjustments to base-year data effective in either the "next prospective year" or the "subsequent prospective year," depending on whether the "review or appeal" concludes before or after July 3 of that year, *see* Former Rule § 355.8063(k)(1)(A)—or, alternatively, the error-correction rule—which permits rate adjustments and payment reprocessing to correct certain errors during the "current state fiscal year," but not earlier ones. *See id.* § 355.8063(c). HHSC, like the ALJ in its June 2010 order, maintains that "prospective" or "current" years under these rules would necessarily apply with reference to the time at which the administrative determination is made (e.g., the "current year" of FY 2010, "next prospective year" of FY 2011, etc.), rather than in any earlier years.

Informed by this view of the supreme court's judgment, HHSC purports to challenge only the portion of the district court's judgment enjoining the agency "from applying the February 28 cutoff/deadline on Plaintiffs' base year claims data used to calculate Plaintiffs' Medicaid Standard Dollar Amounts *for state fiscal years 2002 through 2009*," and then only to the extent this injunction applies to rate calculations made prior to the supreme court's April 2008 mandate. HHSC concedes that the other portions of the district court's judgment merely restate the legal effect of the

24

supreme court's judgment (at least as the agency views the high court's judgment). That is, HHSC acknowledges that the district court's judgment declaring its prior judgment a nullity simply restates the legal effect of the supreme court's judgment of reversal, and perceives that the district court's judgment that the Hospitals "are entitled to a review of individual claims data" before its Appeals Division does not, in itself, add anything to the supreme court's judgment. HHSC further reasons that the district court's injunction tracks the legal effect of the supreme court's injunction to the extent it operates from date of mandate—the date on which the supreme court's injunction could be enforced by the district court[16]—to bar use of the February 28 cutoff in any rate calculations thereafter (although, again, no post-mandate rate calculations were ultimately completed until FY 2010). But the portion of the district court's injunction that purports to apply to calculations of "Plaintiffs' Medicaid Standard Dollar Amounts for state fiscal years 2002" through the date of mandate, HHSC complains, presumes a "retroactive" recalculation that the supreme court did not award or require.

In granting this additional "retroactive" relief on remand, HHSC adds, the district court: (1) erroneously purported to enjoin pre-injunction conduct not previously made unlawful; (2) awarded relief barred by sovereign immunity, as the recalculation the injunction contemplates would have no conceivable purpose or effect but to establish an entitlement to retrospective monetary relief from the State against which the Legislature has not waived immunity;[17] and (3) awarded relief that was inconsistent with HHSC's unchallenged appeal and

---

[16] *See In re Long*, 984 S.W.2d 623, 626 (Tex. 1999) (per curiam).

[17] Alternatively, HHSC suggests that if this recalculation does not have this purpose or effect, there would be, for this reason alone, no justiciable controversy underlying the "retrospective" portion of its injunction.

25

error-correction rules, which do not permit retrospective adjustments to reimbursement rates. HHSC further suggests that because it is thus impossible to have "retroactive" adjustments to rates and reimbursements that predate the supreme court's mandate, the district court's injunction was moot to the extent it purported to apply to calculation of those earlier rates.

**Motion to dismiss**

The Hospitals, in response, insist that the district court's judgment in its entirety merely tracks what is already explicit or implicit in the supreme court's judgment. As a threshold matter, however, they urge that HHSC's arguments to the contrary bring its appeal within the exclusive jurisdiction of the supreme court. Accordingly, they have moved that we dismiss this appeal for want of subject-matter jurisdiction.

---

HHSC also goes further to label the "retrospective" portion of the injunction as in itself "money damages" or "retrospective monetary relief" that implicates sovereign immunity. Based on this characterization, HHSC complains that the district court erred in awarding relief that the Hospitals did not request in their pleadings—they did not purport to seek "money damages" or other retrospective monetary relief. The agency similarly emphasizes what it portrays as inconsistencies between the Hospitals' current position that the district court's injunction tracks the supreme court's judgment (discussed below) and instances in the supreme court proceedings where the Hospitals disclaimed any present claim for monetary relief. The Hospitals respond that they have not yet asserted any claim for monetary relief, per se, nor did the district court award such relief, but have only sought and obtained relief contemplating a *recalculation* of the reimbursement rates under which they should have been paid beginning in FY 2002. Only if and when those recalculations determine that they were actually "underpaid" reimbursement during any of those years, the Hospitals explain, would they then seek to recover the difference through subsequent administrative or judicial proceedings. Although we ultimately agree with the Hospitals that they have not purported to request "damage" or retrospective monetary relief, per se, in this proceeding, the distinction ultimately makes little difference with respect to sovereign immunity, as we explain below.

26

In support of their dismissal motion, the Hospitals emphasize language from this Court's opinion in *Bilbo Freight Lines, Inc. v. State*, 645 S.W.2d 925 (Tex. App.—Austin 1983, writ ref'd n.r.e.). *Bilbo* involved a 1963 suit by the State against a common carrier, V.C. Bilbo, seeking declaratory and injunctive relief prohibiting Bilbo from transporting certain commodities that the State alleged were not authorized by his motor carrier's certificate. *See id.* at 925. The trial court denied all relief requested. This Court affirmed in part and reversed and rendered in part, declaring that the carrier could transport some of the commodities in dispute but not others. The State sought writ of error from the supreme court, which reversed and rendered judgment declaring that the carrier was not authorized to transport any of the commodities at issue. *State v. Bilbo*, 392 S.W.2d 121, 122 (Tex. 1965); *Bilbo Freight Lines, Inc.*, 645 S.W.2d 925 at 926. However, the portion of the trial court's judgment denying injunctive relief was never reversed by either appellate court. *See Bilbo Freight Lines, Inc.*, 645 S.W.2d 925 at 926. Mandate issued in 1965.

Approximately seventeen years later, in 1982, the State filed in the trial court what it styled as a motion for judgment pursuant to the supreme court's mandate, but also sought the same injunctive relief that it had sought and been denied in the original suit. *See id.* The trial court granted the motion for judgment, and an appeal was taken to this Court. Of relevance here, we held that we lacked jurisdiction because the appellant was complaining that "the trial court . . . erred in construing the mandate of the Supreme Court." *Id.* at 927. In this regard, we reasoned that "[o]nly the Supreme Court has jurisdiction over this cause to ensure compliance with this mandate. The interpretation of the Supreme Court's judgment and mandate lies *exclusively* with that Court." *Id.* (emphasis in original). In support, we relied on often-quoted language from *Conley v. Anderson*,

27

164 S.W. 985 (Tex. 1913), in which the supreme court had restrained a trial court's actions in a subsequent suit that the high court deemed to impede enforcement of one of its prior judgments:

> this court, having upon writ of error reversed the judgment of the district court in the former suit, and having entered final judgment in that case, no district court had jurisdiction to review that judgment, nor to interpret and enforce it, but must observe it as it was framed by this court. *The interpretation and enforcement of that judgment belongs exclusively to this court, and no interference with its enforcement will be tolerated.*

*Bilbo Freight Lines, Inc.*, 645 S.W.2d at 927-28 (quoting *Conley*, 164 S.W. at 986) (emphasis in original). Citing *Conley*, we concluded that "[o]nly the Supreme Court has the jurisdiction over this cause to ensure compliance with this mandate" and to "construe and enforce its own judgment." *Id.* at 927-28.

To the extent that the Hospitals are suggesting that lower courts literally have no jurisdiction to interpret an appellate court's judgment or mandate, even if only to determine their meaning in order to comply, that notion is belied by more recent Texas Supreme Court decisions. *See Hudson*, 711 S.W.2d at 630 (instructing that "courts should look not only to the mandate itself, but also to the opinion of the court," to ascertain what is being commanded by the mandate); *see also Madeksho v. Abraham, Watkins, Nichols & Friend*, 112 S.W.3d 679, 684 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (en banc) (plurality op.) (citing *Hudson* and positing, "If lower courts cannot 'interpret' appellate mandates, why has the [Supreme] Court authorized us to use its related opinion to do just that?" and suggesting that "this language has never been applied literally"). The core notion underlying decisions like *Conley*, as we have more recently observed, is simply that a higher court's mandate imposes a mandatory, ministerial duty on the lower court to comply with the

28

higher court's judgment. *See Dearing*, 240 S.W.3d at 347. It is in this respect that the lower court has no "jurisdiction" or "discretion" in regard to "reviewing" or "interpreting" the mandate. *See id.*

It is true, as we observed in *Bilbo*, that mandamus to the higher court may be a proper remedy where it is alleged that a lower court's actions threaten to nullify the effect of the higher court's judgment or otherwise impair its appellate jurisdiction. *See In re Nolo Press/Folk Law, Inc.*, 991 S.W.2d 768, 775 (Tex. 1999) ("we have repeatedly construed [Article V, Section 3 of the Texas Constitution] as authorizing the Court to issue writs only when a lower court's action threatens to impair our appellate jurisdiction or nullify the effect of our judgments"); *Cherokee Water Co. v. Ross*, 698 S.W.2d 363, 365-66 (Tex. 1985, orig. proceeding) (per curiam) (issuing writs of mandamus and prohibition to bar trial court from violating supreme court's judgment and mandate by relitigating issues on remand on which the high court had rendered judgment); *City of Orange v. Clark*, 627 S.W.2d 146, 147 (Tex. 1982, orig. proceeding) (per curiam) (same). That was the situation in both *Conley* and *Bilbo*, each of which involved trial court orders that were alleged to conflict with final judgments of the supreme court. *See Conley*, 164 S.W. at 986; *Bilbo Freight Lines, Inc.*, 645 S.W.2d at 927-28. However, HHSC is not advancing that sort of complaint here.

HHSC is not contending that the district court has violated the supreme court's mandate or interfered with the high court's judgment. To the contrary, it asserts that the district court has erred with respect to issues that were *not* addressed in the supreme court's judgment and that the high court left to the lower court to address on remand. The same is true of the Hospitals: they are contending that the district court's judgment merely restates the supreme court's judgment. Even accepting the Hospitals' premise as accurate, it would remain that

29

HHSC, as appellant, is not contending that the district court violated the mandate or interfered with the supreme court's judgment. Although HHSC has advocated a view of the supreme court's judgment that, as the Hospitals see it, would fail to give effect to the high court's judgment, HHSC's view did not prevail in the district court. Consequently, the district court's judgment, and HHSC's appeal challenging it, do not implicate the jurisdictional concerns that the Hospitals raise. Accordingly, we overrule the Hospitals' motion to dismiss.

**The supreme court's judgment**

On the other hand, if, as the Hospitals assert in their dismissal motion, the district court's judgment merely restates the legal effect of the supreme court's judgment, the Hospitals would win on the merits: we would be required to overrule HHSC's appellate contentions and affirm. *See Dearing*, 240 S.W.3d at 347-48 (explaining trial court's mandatory duty on remand to comply with appellate court's mandate, as well as further constraints of the law-of-the-case doctrine). The primary analytical linchpin of the Hospitals' position is their view—introduced in their motion on rehearing in the supreme court—that the supreme court's invalidation of the February 28 cutoff served to retroactively and immediately invalidate all of HHSC's reimbursement rates that had been derived from the FY 2000 base-year data to which the cutoff had been applied—i.e., the rates in FY 2002 forward through 2009—"paving the way" for recalculation of those rates in accordance with FY 2000 base-year data that included the post-February 28 claims data. For that proposition, the Hospitals rely primarily on *All Saints Health Systems*, 125 S.W.3d 96.

*All Saints* was one of several appeals arising from an "epic legal dispute" pitting numerous hospitals against numerous workers' compensation insurers and self-insurers (collectively, "insurers") concerning the validity of rates (termed "fee guidelines") promulgated by the workers' compensation commission to establish the reimbursement amounts that the insurers were required to pay the hospitals for services provided to workers' compensation claimants. *See id.* at 98-102. For several years during the late 1980s and early 1990s, the commission had promulgated a series of temporary or emergency fee guidelines that tied reimbursement to specified percentages of the hospitals' billed fees. *See id.* at 98-100. After a 1991 emergency fee guideline expired, the commission operated without an explicit guideline for a period of time until it promulgated a new fee guideline (the "1992 Fee Guideline") that eschewed the former fee-for-service approach in favor of a new per-diem reimbursement scheme. *See id.* at 100. The hospitals brought suit under APA section 2001.038, asserting that the 1992 Fee Guideline was invalid for failure to comply with the APA's reasoned-justification requirement. *See id.*; *Hospitals & Hosp. Sys. v. Continental Cas. Co.*, 109 S.W.3d 96, 97-98 (Tex. App.—Austin 2003, pet. denied). Although the district court denied temporary injunctive relief against the 1992 Fee Guideline's implementation and later upheld the 1992 Fee Guideline on the merits, this Court ultimately reversed, declared the 1992 Fee Guideline invalid, and enjoined its enforcement. *See All Saints*, 125 S.W.3d at 100 & n.5; *Hospitals & Hosp. Sys.*, 109 S.W.3d at 97-98.

In the interim between the 1992 Fee Guideline's implementation in 1992 and this Court's 1995 ruling, and for an additional period before the proceeding became final and mandate finally issued, the insurers continued to pay, and the hospitals continued to accept,

31

workers' compensation reimbursement calculated in accordance with the 1992 Fee Guideline. *See All Saints*, 125 S.W.3d at 100; *Hospitals & Hosp. Sys.*, 109 S.W.3d at 97-98. Subsequently, the hospitals sought to have their reimbursement claims dating back to the 1992 Fee Guideline's implementation reexamined through the medical dispute resolution process provided under the workers' compensation act, and additional reimbursement paid accordingly. *See All Saints*, 125 S.W.3d at 101; *Hospitals & Hosp. Sys.*, 109 S.W.3d at 98; *see also* Tex. Lab. Code Ann. § 413.031(a)(1), (c) (West Supp. 2003). The commission denied the hospitals' claims for additional reimbursement, and some of the hospitals sought hearings on their claims before SOAH. *See All Saints*, 125 S.W.3d at 101; *Hospitals & Hosp. Sys.*, 109 S.W.3d at 98-99. The SOAH ALJ ordered briefing on several threshold legal issues, including the applicability of a one-year limitations period under the commission's rules governing claims in the commission's medical dispute resolution process and the legal standard or standards that governed reimbursement amounts now that the 1992 Fee Guideline had been invalidated. *See All Saints*, 125 S.W.3d at 101; *Hospitals & Hosp. Sys.*, 109 S.W.3d at 99.

Persuaded by arguments advanced by the insurers, the ALJ ultimately held that the one-year limitations period did not apply to the administrative proceedings and that reimbursement would be governed by a direct application of the underlying statutory standards of "fair and reasonable" reimbursement. *See All Saints*, 125 S.W.3d at 101; *Hospitals & Hosp. Sys.*, 109 S.W.3d at 99. These rulings prompted the hospitals to sue the commission and insurers under APA section 2001.038, seeking declarations that the one-year limitations period did not apply and that reimbursement was instead governed by the fee-for-service-based 1991 emergency fee guideline

32

that had preceded the 1992 Fee Guideline. *See All Saints*, 125 S.W.3d at 101 & n.7; *Hospitals & Hosp. Sys.*, 109 S.W.3d at 99 & n.5. The SOAH proceedings "were accordingly abated." *All Saints*, 125 S.W.3d at 101-02. The district court severed the claims presenting the two questions into separate causes and granted summary judgment in favor of the insurers as to each. *See id.*, 125 S.W.3d at 102; *Hospitals & Hosp. Sys.*, 109 S.W.3d at 99. The hospitals perfected appeals in each of the two causes. In *Hospitals and Hospital Systems*, we affirmed the district court's ruling on the limitations issue, which served to bar all of the hospitals' claims for additional reimbursement except those that had been submitted within the one-year period. 109 S.W.3d at 99-103. In *All Saints*, we addressed the hospitals' appeal regarding the applicable reimbursement standard.

As framed by the parties, the basic dispute in *All Saints* came down to a choice between two potentially applicable standards governing adequacy of reimbursement payments—the 1991 emergency fee guideline, advocated by the hospitals, which was based upon a percentage-of-fee-for-services model; and an application of the underlying statutory requirement of "fair and reasonable" reimbursement, advocated by the insurers. *See All Saints*, 125 S.W.3d at 102. In advocating their position, the hospitals relied upon, and this Court reaffirmed, the concept that "the appropriate remedy following the invalidation of an administrative rule under the APA is to return to the last validly adopted legal standard existing at the time of the rule's promulgation." *Id.* at 103. In so doing, we cited with approval a 1939 case in which we had held "that, under the old Railroad Commission Act, services rendered under an invalid rate will be recompensed at the validly enacted rate in place at the time the invalid rate was adopted," and further recognized that carriers and shippers could sue each other for "restitution" or "reparation" for over- or under-charges

33

attributable to the past imposition of the invalidated rates. *Id.* at 103 (citing *Gulf, C. & S. F. Ry. Co. v. American Sugar Ref. Co.*, 130 S.W.2d 1030, 1034 (Tex. Civ. App.—Austin 1939, writ ref'd)). We also stated that "this rule is appropriate because it prevents agencies from retroactively imposing regulations not originally adopted in compliance with the APA's requirements." *Id.* (citing *Gulf, C. & S. F. Ry. Co.*, 130 S.W.2d at 1034). We additionally analogized this rule to the legal effect of declaring a statute invalid, as depicted in two cases describing the consequence in terms of rendering the statute "no law at all," "wholly void, and in legal contemplation . . . as inoperative as if it had never been passed," and "leav[ing] the question that it purports to settle just as it was prior to its ineffectual enactment." *Id.* (citing *In re Johnson*, 554 S.W.2d 775, 787 (Tex. Civ. App.—Corpus Christi 1977), *writ ref'd n.r.e.*, 569 S.W.2d 883 (Tex. 1978); *Genzer v. Fillip*, 134 S.W.2d 730, 733 (Tex. Civ. App.—Austin 1939, writ dism'd)); *see Johnson*, 554 S.W.2d at 787; *Genzer*, 134 S.W.2d at 732-33 (quoting 11 Am. Jur. § 148, p. 827).

While reaffirming the principle that the governing legal standard reverted back to the "last validly adopted one" prior to the invalidated rule's promulgation, we held that the principle did not point to application of the 1991 emergency fee guideline because that guideline had already expired before the 1992 Fee Guideline took effect; thus, it was not the last valid legal standard in effect prior to the promulgation of the invalid 1992 Fee Guideline. *See id.* Instead, we reasoned that the governing standard defaulted to a case-by-case application of the statutory standards. *See All Saints*, 125 S.W.3d at 103-04. Nonetheless, we concluded that this case-by-case application had to reflect the commission's policies prior to its implementation of the invalidated 1992 Fee Guideline—a fee-for-services approach rather than the per-diem approach implemented in the

34

invalidated Guideline—because "when a rule adopting a new policy is declared invalid, that policy cannot be applied until a new, properly adopted rule becomes effective." *Id.* at 104-06; *see also id.* at 107 ("When a rule is invalidated based on the APA's reasoned justification requirement, both its specific provisions and any concomitant policy changes revert to the standard in place at the time of the rule's adoption.").

From *All Saints*, the Hospitals derive two sets of principles which, they assert, must inform our view of the supreme court's judgment. First, they urge that the legal effect of the supreme court's judgment declaring the February 28 cutoff invalid was to render it retroactively "void" and wholly inoperative—a nullity—at all times relevant to this litigation. In addition to citing *All Saints* as support for this view, the Hospitals observe that this Court has previously described the legal effect of invalidating an agency rule under the pre-1999 APA as rendering it "void," *see, e.g.*, *Lower Laguna Madre Found. v. Texas Natural Res. Conservation Comm'n*, 4 S.W.3d 419, 421 n.4 (Tex. App.—Austin 1999, no pet.); *Texas Hosp. Ass'n v. Texas Workers' Comp. Comm'n*, 911 S.W.2d 884, 888 (Tex. App.—Austin 1995, writ denied), and "void," they insist, is synonymous with void *ab initio*, and denotes a legal nullity from its inception, i.e., something that is considered never to have existed. *See Love Terminal Partners, L.P. v. City of Dallas*, 256 S.W.3d 893, 897 & n.7 (Tex. App.—Dallas 2008, no pet.) (contrasting "voidable," denoting an act "valid until adjudicated and declared void," with "void" or "void ab initio," both denoting an act that is a "nullity"). And if the February 28 cutoff was void and a nullity at all times relevant to the litigation, the Hospitals further reason, it follows that any reimbursement rates derived from FY 2000 base-year data to which the "void" cutoff had been applied were likewise retroactively void and a nullity, as

35

to conclude otherwise would amount to retroactively imposing the invalidated cutoff itself and the "concomitant policy change" it represented. *See All Saints*, 125 S.W.3d at 103, 107.

Second, having concluded that the February 28 cutoff had been retroactively invalidated, the Hospitals urge that the governing legal standard during the relevant time period reverts back to the "last validly adopted legal standard" prior to the cutoff's adoption—Former Rule § 355.8063 as promulgated, minus the "interpretation" of "base year" to exclude the post-February 28 claims data. *See All Saints*, 125 S.W.3d at 103. And, because there were, in concept, no reimbursement rates in effect during this period, the Hospitals maintain, it follows that HHSC would be required to recalculate the rates under the correct legal standards, just as occurred in *All Saints* and *Gulf, Colorado and Santa Fe Railway Company*. These calculations, the Hospitals add, would necessarily be subject to the supreme court's injunction against enforcement of the February 28 cutoff. *See El Paso Hosp. Dist.*, 247 S.W.3d at 715. Although admittedly applying to recalculations of reimbursement rates from prior years that had been retrospectively invalidated, the injunction itself, the Hospitals insist, would nonetheless operate prospectively because the HHSC "will be adjusting, i.e., calculating and applying, the . . . rates *as if for the first time.*" (Emphasis in original.) Consequently, the Hospitals conclude, the so-called "retroactive" portion of the district court's injunction is not retroactive after all, and merely tracks what is already implicit in the supreme court's judgment.

HHSC urges that the supreme court's opinion and judgment do not purport to invalidate reimbursement rates retroactively or explain what would happen next. The agency is correct—the opinion and judgment do not explicitly state whether or how the court's holdings

36

apply to reimbursement rates or payments prior to judgment. *See generally El Paso Hosp. Dist.*, 247 S.W.3d at 713-16. This is not surprising because, as previously discussed, both HHSC *and the Hospitals* dissuaded the supreme court from addressing "retroactivity issues" on rehearing. While the Hospitals now insist that they were referring solely to whether they were entitled to monetary relief, per se, as opposed to a judgment having the effect of retrospectively invalidating prior years' reimbursement rates and "paving the way" for recalculations and payment adjustments, it remains that the supreme court did not expressly mention either sort of retroactive effect. However, the Hospitals ultimately rely less on the explicit text of the supreme court's opinion and judgment than on what they perceive to be the inherent legal effect or implication of the court's invalidation of the February 28 cutoff, as informed by their reading of *All Saints* and *Gulf, Colorado and Santa Fe Railway Company*.

We agree with the Hospitals to the extent that the supreme court's invalidation of the February 28 cutoff would, in theory, have the effect of rendering it inoperable, as if it had never existed. *See All Saints*, 125 S.W.3d at 103. In turn, this would, in theory, render erroneous reimbursement rates derived from the cutoff's application to the FY 2000 base-year data, to the extent that calculating these rates without applying the cutoff would have yielded any differences. Where differences between the correctly calculated rates and original ones existed, we further agree with the Hospitals that the supreme court's injunction, once effective, would prohibit HHSC from thereafter paying reimbursement under the incorrect rates, as this would amount to "enforcement" of the February 28 cutoff through reliance on FY 2000 base-year data made incorrect by the cutoff's

37

application. *See id.* at 103, 107. However, whether the supreme court's judgment implies that a remedy is available to correct reimbursement rates or payments during earlier years is another matter.

In both *All Saints* and *Gulf, Colorado and Santa Fe Railway Company*, one or more parties were pursuing remedies through which one could recover past "underpayments" attributable to rates subsequently held to be invalid. In *All Saints*, that remedy was provided through the medical dispute resolution procedures under section 413.031 of the labor code, whereby the hospitals had the right to seek adjudication of reimbursement claims for which insurers "denied payment or paid a reduced amount for the medical service rendered," first within the agency, then through a contested-case hearing before SOAH if still aggrieved, with a right to judicial review thereafter. *All Saints*, 125 S.W.3d at 100-01; *see* Tex. Lab. Code Ann. § 413.031(a) (1), (c), (k), (k-1) (West Supp. 2010). In *Gulf, Colorado and Santa Fe Railway Company*, the remedy was an equitable claim considered to be ancillary to a statutory right of judicial review whereby railroad commission rate orders could be directly challenged and invalidated. *See Gulf, C. & S. F. Ry. Co.*, 130 S.W.2d at 1033-35. Given the existence of these remedies in each case, there was a live, justiciable controversy regarding the applicable rates dating back to the origins of the dispute. In this context, *All Saints* and *Gulf, Colorado and Santa Fe Railway Company* amount to applications of the principle that judicial decisions are generally presumed to operate retroactively with respect to such controversies. *See, e.g.*, *Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 515-16 (Tex. 1992); *Bowen v. Aetna Cas. & Sur. Co.*, 837 S.W.2d 99, 100 (Tex. 1992) (per curiam); *cf. City of El Paso v. Heinrich*, 284 S.W.3d 366, 369-77 (Tex. 2009).

The scope of HHSC's appeal is consistent with a recognition that, as of the date of the supreme court's judgment, the contemplated remedy of "review of individual claims data excluded by the February 28 cutoff" via the appeals rule, *see El Paso Hosp. Dist.*, 247 S.W.3d at 716, could have yielded rate adjustments that impacted reimbursement rates and payments as early as FY 2009, or even during FY 2008. The appeal rule provided for adjustments to the rates in either (1) "the next prospective year," if the "review or appeal is completed at least 60 days before the beginning of the next prospective year" (i.e., by July 3), or else (2) "only to the subsequent prospective year." Former Rule § 355.8063(k)(1)(A). Assuming these terms are construed, as HHSC urges, to refer to the time at which the "review or appeal" yielding the change is concluded—an issue we address below—the Hospitals could have obtained rate changes effective in FY 2009 if their "review or appeal" had concluded by July 3, 2008. Additionally, the Hospitals' appeal could have revealed an "error condition" that implicated the error-correction rule, triggering adjustments to reimbursement rates and payments within the "current state fiscal year," *see id.* § 355.8063(c)—at the time of judgment, FY 2008—although HHSC insists that no such adjustment could have been made with respect to rates and payments prior to the date of mandate. While HHSC emphasizes that no such adjustments were ultimately made until FY 2010, it seems to acknowledge that, at least as of the time of the supreme court's judgment, the reimbursement rates applicable in FY 2008 (at least after mandate) and FY 2009 were subject to change through the Hospitals' administrative appeals. Through the limited scope of its appeal, HHSC seems to acknowledge that the supreme court's declaratory and injunctive relief would, in these ways, apply to the determination of reimbursement rates applicable during FY 2008 and 2009, which in turn would mean that the portion of the

39

district court's injunction addressed to those periods would merely track the legal effect of the high court's judgment.

HHSC further acknowledges that if, hypothetically, the Hospitals had been pursuing a remedy through which they could have obtained adjustments to their Medicaid reimbursement payments or rates from earlier time periods, the supreme court's judgment would have had application to the rates applicable to those earlier periods. HHSC suggests that this might have been the case if, for example, the Legislature had provided a right to judicial review from specific reimbursement payment decisions or the agency's disposition of the Hospitals' 2001 administrative appeals, and this had been the remedy that the Hospitals had pursued through the intervening years. But the Legislature did not provide the Hospitals a right to judicial review from that order, HHSC points out, and it asserts that the Hospitals did not pursue—and could not have pursued—any other remedy that could have the effect of changing the reimbursement payments or rates during prior years.

HHSC emphasizes that the Hospitals have pursued only declaratory claims under APA section 2001.038 that did not directly challenge the amount of past reimbursement payments or past reimbursement rates. Instead, HHSC observes, the claims challenged only (1) the validity of the February 28 cutoff "rule" and (2) the agency's application of the appeal rule to classify the Hospitals' complaints regarding exclusion of the post-February 28 claims data as unreviewable "methodology" issues rather than "data-entry" issues. And neither declaration could have impacted reimbursement rates in effect prior to the supreme court's judgment, HHSC reasons, because the Hospitals' 2001 administrative appeals concerning the FY 2002 rates had long since concluded, the

Hospitals' section 2001.038 claims could not have "revived" or "kept alive" those appeals, and the Hospitals had not initiated any additional administrative proceedings concerning rates in the subsequent years prior to judgment. Absent a live, pending proceeding in which the past years' rates were at stake, HHSC urges that the Hospitals' section 2001.038 claims could have had no effect on those rates. In support, it cites several decisions from this Court. *See Texas Logos, L.P. v. Texas Dep't of Transp.*, 241 S.W.3d 105, 123-24 (Tex. App.—Austin 2007, no pet.) (reasoning that relief available under section 2001.038 did not extend to invalidating final order from agency proceeding in which rules had already been applied and that, consequently, there was no justiciable controversy to support a section 2001.038 claim); *see also Creedmoor-Maha Water Supply Corp.*, 307 S.W.3d at 526 n.16 (justiciable controversy that could have supported section 2001.038 claim "was rendered moot by TCEQ's final, unappealable order"); *Friends of Canyon Lake, Inc. v. Guadalupe-Blanco River Auth.*, 96 S.W.3d 519, 529 (Tex. App.—Austin 2002, pet. denied) (no justiciable controversy to support section 2001.038 claim where challenge would have legal effect only in context of administrative proceeding that had become final due to claimant's failure to seek a contested-case hearing). To preserve a live, justiciable controversy regarding the reimbursement rates applicable during prior years, HHSC further suggests, the Hospitals should have sought an abatement or stay of their administrative appeals while they pursued their section 2001.038 claims, like the hospitals in *All Saints* evidently did. *See All Saints*, 125 S.W.3d at 101-02 (noting that the SOAH proceedings "were accordingly abated" after hospitals filed section 2001.038 claims).

We cannot ignore that the supreme court, as previously explained, tacitly rejected HHSC's similar assertions on rehearing that the "data-entry"-versus-"methodology" dispute was

41

moot because the agency's 2001 orders had not been subject to judicial review, were long since final, and could not be "collaterally attacked" or "revived" by the Hospitals' rule-application claim. *See El Paso Hosp. Dist.*, 247 S.W.3d at 716. On appeal, HHSC, shifting focus, offers the explanation that "the Hospitals' section 2001.038 claim regarding the appeal rule[] remained justiciable because there was an ongoing controversy—specifically, HHSC continued to pay the Hospitals using rates calculated using the cutoff-date rule," such that the requested declaration that the Hospitals' complaint involved a "data-entry" rather than "methodology" issue would have application in "*new* appeals" that the Hospitals would then have the opportunity to pursue. (Emphasis in original.) However, in its opinion, the supreme court does not mention anticipated future administrative appeals by the Hospitals, but speaks only to events and issues in the Hospitals' original 2001 administrative appeals:

> The Hospitals also complain that HHSC improperly *applied* its administrative appeals rules. The Hospitals contend that HHSC *was required* to refer their appeal for a formal hearing with the State Office of Administrative Hearings.
>
> . . . .
>
> The court of appeals concluded that HHSC *was not required* to grant a formal review "[b]ecause the mathematical or data entry errors alluded to by the Hospitals did not pertain to individual claims but, rather, to how the claims selection process in the aggregate could lead to mathematical or data entry errors." 161 S.W.3d at 594. Because the February 28 cutoff is invalid, however, *the Hospitals' administrative appeals do not question* HHSC's payment methodology but rather the omission of individual claims. Applying the base-year rule without the February 28 cutoff, the only issue is whether HHSC has included all the claims arising during the twelve-month base-year period. *See* 1 TEX. ADMIN. CODE §§ 355.8063(b)(5), (n). This inquiry involves a reviewable "data entry" claim. *See id.* § 355.8063(k)(1). Thus, we conclude that the Hospitals *were entitled* to a review of individual claims data excluded by the February 28 cutoff.

*El Paso Hosp. Dist.*, 247 S.W.3d at 716 (emphases added); *see also id.* at 711 ("We further conclude[] that the Hospitals *are entitled* to have their excluded data entry claims reviewed.") (emphasis added). Furthermore, in noting that "the Hospitals' administrative appeals *do not* question HHSC's payment methodology . . . ," it is significant that the court used a present-tense form of the verb "question," as contrasted with "did not question," "would not question," or "will not question." This usage denotes a recognition or assumption by the supreme court that the "administrative appeals" (which could only have been the ones the Hospitals filed in 2001) were currently pending and that this would be the procedural context to which its declaratory and injunctive relief would apply. In short, it would appear that the supreme court viewed the relevant controversy to be framed by an ongoing refusal by HHSC to refer the Hospitals' 2001 administrative appeals for formal hearing, as opposed to an expectation that HHSC would assert the same position in some future administrative appeal. While HHSC argues strenuously that this conclusion could not be correct due to the limited scope of the section 2001.038 declaratory remedy or the finality of its orders, the lower courts are bound to give effect to the judgment that the supreme court has rendered. *See Dearing*, 240 S.W.3d at 347-48 (under law-of-the-case doctrine, correctness of appellate court's judgment may only be revisited by the same court or a higher one); *see also Hudson*, 711 S.W.2d at 630 (we look to opinion for guidance in ascertaining what supreme court has commanded in its mandate).

On the other hand, as HHSC points out, it does not follow from these conclusions that the Hospitals' administrative appeals would necessarily yield rate adjustments that reverted back to when those proceedings were first initiated, as the Hospitals contend. As HHSC emphasizes, the appeals would be governed by Former Rule § 355.8063's appeal rule and error-correction rule, and

nothing in the supreme court's opinion or judgment purports to change this. Under the appeal rule, again, any "adjustment" to reimbursement rates resulting from recalculation of the FY 2000 base-year data would be applied either to (1) "the next prospective year," if the "review or appeal is completed at least 60 days before the beginning of the next prospective year," or else (2) "only to the subsequent prospective year." Former Rule § 355.8063(k)(1)(A). As for the error-correction rule, while HHSC would be required to "move[] the provider into the correct payment division [and] reprocess[] claims" using the correct reimbursement rate if it determines there has been an error impacting a hospital's rates, "[t]he correction of this error condition only applies to the current state fiscal year payments," and "[n]o corrections are made to payment rates for services provided in previous state fiscal years." *Id.* § 355.8063(c).

In light of these limitations on the remedies available under Former Rule § 355.8063, whether the Hospitals could obtain adjustments to reimbursement rates or payments dating back to FY 2002 would ultimately turn on how the terms "next prospective year" and "current state fiscal year" are interpreted: (1) do they apply from the perspective of the time at which the administrative correction or adjustment of rates or payments is actually made (which would necessarily occur sometime after the supreme court's judgment, and which ultimately did not occur here until FY 2010), or (2) do they comprehend application as of when the dispute began in 2001 (making FY 2002 the "next prospective year" and the earliest "current state fiscal year" in which an "error condition" could have been corrected)? The supreme court was not called upon to answer this rule-application question, and did not explicitly answer it. *See El Paso Hosp. Dist.*, 247 S.W.3d at 713-16. Nor can we conclude that anything in its opinion or judgment did so by implication or

44

legal effect. Although the Hospitals emphasize their concept that the supreme court's invalidation of the February 28 cutoff rendered both the cutoff and any resulting rates legal nullities—as if never implemented—such a conclusion would not in itself dictate the appropriate remedy for the omission or failure[18] or how the remedies provided in Former Rule § 355.8063 would apply in those circumstances.

We must ultimately answer this question ourselves in order to determine the range of fiscal years' rate calculations to which the supreme court's judgment applied. At this juncture, as previously explained, we now have the benefit of a final HHSC order reflecting the agency's interpretation of "next prospective year" and "current state fiscal year." That interpretation holds that these terms refer to the time at which the rate or payment adjustments are made rather than the time at which the proceeding or dispute originated. We defer to an agency's interpretation of its own rules unless that interpretation is plainly erroneous or inconsistent with the rule's text. *See Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991); *Tennessee Gas Pipeline Co. v. Rylander*, 80 S.W.3d 200, 203 (Tex. App.—Austin 2002, pet. denied). We construe administrative rules in the same manner as statutes because they have the force and effect of statutes. *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). The primary guiding force of statutory construction is the ordinary meaning of the words chosen. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) ("[W]hen possible, we discern [legislative intent] from the

---

[18] *See, e.g.*, *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373-76 (Tex. 2009) (explaining how otherwise-permissible ultra vires declaratory or injunctive claims to enforce statutory duties are nonetheless barred by sovereign immunity to the extent the relief would have the effect of awarding retrospective monetary relief).

plain meaning of the words chosen."). We cannot conclude that construing "next prospective year" to mean the year beginning immediately after the present point in time, not some earlier one, and "current state fiscal year" to mean the year that includes the present point in time, not some earlier one, is plainly erroneous or inconsistent with the ordinary meaning of these words and phrases.

For these reasons, we conclude that the "review of individual claims data excluded by the February 28 cutoff," as contemplated by the supreme court's judgment, did not provide the Hospitals a remedy with respect to the reimbursement rates applicable during FY 2002 through 2007, due to the limitations of Former Rule § 355.8063. However, we conclude that it did provide the Hospitals a remedy with respect to rates in FY 2008 forward by virtue of the error-correction rule. As of the date of the supreme court's judgment (and, for that matter, its mandate), FY 2008 was the "current state fiscal year" for which reimbursement rates and payments still remained subject to adjustment. FY 2008 began on September 1, 2007 and ended on August 31, 2008. Although a portion of this period predated the supreme court's mandate, the effect of the error-correction rule was that HHSC's payment obligations during a particular state fiscal year would not be fully discharged until the end of that year, as that year's reimbursement rates and payments would remain subject to adjustment until that time. *See* Former Rule § 355.8063(c).[19] In this way, the supreme court's judgment declaring the February 28 cutoff invalid and enjoining its enforcement applies to calculation of the FY 2008 rates. Consequently, the portion of the district court's injunction applicable to the compilation of "claims data used to calculate Plaintiffs' Medicaid

_____

[19] For the same reason, application of the error-correction rule would be in the nature of prospective enforcement of a payment obligation rather than an imposition of retrospective monetary relief under the *Heinrich* analysis, discussed below.

46

Standard Dollar Amounts" for state fiscal years 2008 and 2009 merely tracks what was already implicit in the supreme court's judgment.

The Hospitals, emphasizing *All Saints* and *Gulf, Colorado and Santa Fe Railway Company*, suggest the supreme court's invalidation of the February 28 cutoff independently implies the existence of a remedy with respect to reimbursement rates and payments in FY 2002 through 2007. Whatever remedial implications these cases might have in other contexts, they are limited here by sovereign immunity. In its seminal *Heinrich* decision—issued after the district court rendered the judgment on appeal—the Texas Supreme Court clarified that while a statutory payment obligation of the government may be enforceable through prospective declaratory or injunctive relief, "as measured from the date of injunction," *see Heinrich*, 284 S.W.3d at 371-72, 376, sovereign or governmental immunity generally bars such relief to the extent it establishes or enforces retrospectively a right to payment accruing prior to that time. *See id.* at 373-76. The dispute in *Heinrich* involved a municipal pension beneficiary who sued the city for declaratory and injunctive relief to rectify what she alleged were misinterpretations or misapplications of rules (specifically, the pension fund's bylaws) that had deprived her of her statutorily rightful share of pension payments both in the past and continuing through the present. *See id.* at 369. The Hospitals' complaints here are closely analogous to those in *Heinrich*—the upshot is that HHSC, through misapplications of rules and reliance on an invalid rule, has failed to comply with its statutory duties to pay the Hospitals reasonable and adequate Medicaid reimbursements beginning in FY 2002.

Absent express waiver by the Legislature, sovereign immunity would plainly bar any remedy having the purpose or effect of establishing a right to recover "underpayments" of Medicaid

47

reimbursement in FY 2002 through 2007. *See Heinrich*, 284 S.W.3d at 373-76. This would include a remedy entailing recalculation of the reimbursement rates applicable during those years, as such a remedy would have no other conceivable purpose. *See City of Houston v. Williams*, 284 S.W.3d 827, 828 (Tex. 2007) (sovereign immunity barred declaratory claim concerning statutory authority where declaration had effect of establishing right to retrospective monetary relief); *see also Creedmoor-Maha Water Supply Corp.*, 307 S.W.3d at 515 (observing that "an otherwise proper UDJA claim seeking to construe or invalidate a statute is nonetheless barred by sovereign immunity if the remedy would have the effect of establishing a right to relief against the State that implicates sovereign immunity and for which immunity has not been waived," and compiling cases). Stated another way, judicial resolution of the applicable reimbursement rates in FY 2002 through 2007 would amount to a constitutionally impermissible advisory opinion, because it would serve no purpose other than to declare a right to a remedy that would be barred by sovereign immunity. Although the Hospitals emphasize that they have not as of yet explicitly sought to recover "underpayments," "money damages" or monetary relief, per se, that is not the standard. *See Williams*, 284 S.W.3d at 828.

In neither *All Saints* nor *Gulf, Colorado and Santa Fe Railway Company* was sovereign immunity a litigated issue. *Gulf, Colorado and Santa Fe Railway Company* involved the competing monetary claims of a private railroad and private shipper. *See* 130 S.W.2d at 1031-32. The same is largely true of *All Saints*—the commission's role was to act as a tribunal that decided the hospitals' claims to additional medical reimbursement from what were primarily private insurance carriers. 125 S.W.3d at 100-01, 110-12; *see* Tex. Lab. Code Ann. § 401.031(a)(1), (c), (k-2). Although a few of the insurers were self-insured governmental entities, *see All Saints*,

125 S.W.3d at 110-12, there is no indication in *All Saints* that any of these insurers ever raised sovereign immunity as a bar to the hospitals' claims. Consequently, we question whether *All Saints*, much less *Gulf, Colorado and Santa Fe Railway Company*, stand for the existence of a retrospective monetary remedy that sovereign immunity would otherwise bar. To the extent *All Saints* might be viewed as providing some tacit support for that proposition, we conclude that it is contrary to *Heinrich* and would not survive it. The same is true for the Hospitals' notion that the district court's injunction should be viewed as "prospective" relief under *Heinrich* because it must be viewed from the perspective of FY 2002—*Heinrich*, to the contrary, holds that "prospective" declaratory or injunctive relief is "measured from the date of injunction." *See Heinrich*, 284 S.W.3d at 376.

The Hospitals suggest that any such concerns are resolved by the waiver of sovereign immunity provided in APA section 2001.038. We disagree. Section 2001.038 provides a limited waiver of sovereign immunity, solely to the extent of permitting suits against state agencies for declaratory relief concerning the validity or applicability of their rules. *See* Tex. Gov't Code Ann. § 2001.038(a), (c) (West 2008); *State v. BP Am. Prod. Co.*, 290 S.W.3d 345, 362-63 (Tex. App.—Austin 2009, pet. filed); *Texas Logos, L.P.*, 241 S.W.3d at 123-24; *Texas Dep't of Transp. v. City of Sunset Valley*, 92 S.W.3d 540, 549 (Tex. App.—Austin 2002), *rev'd on other grounds*, 146 S.W.3d 637 (Tex. 2004). It is thus analogous to section 37.006(b) of the UDJA, which provides a limited waiver to the extent of permitting suits against the State for declaratory relief regarding the validity or construction of statutes. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.006(b) (West 2008); *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 634 & n.4 (Tex. 2010). It is established that the limited waiver of sovereign immunity under section 37.006(b)

does not extend to permitting declarations having the effect of establishing a right to retrospective monetary relief, *Williams*, 284 S.W.3d at 828, or other relief that sovereign immunity independently bars. *See Creedmoor-Maha Water Supply Corp.*, 307 S.W.3d at 513-15. The same limitations apply to APA section 2001.038. *See BP Am. Prod. Co.*, 290 S.W.3d at 362-63 (waiver did not extend to determining whether plaintiff had title vis-à-vis the State in order to determine plaintiff's standing to sue under section 2001.038).

Finally, the Hospitals urge that HHSC "waived" sovereign immunity by failing to raise it before the supreme court during the first appeal. Of course, only the Legislature can waive sovereign immunity, strictly speaking,[20] but the substance of the Hospitals' argument is that the supreme court's judgment is predicated on the implied legal conclusion that it possessed subject-matter jurisdiction to award the relief it did (i.e., that the relief was not barred by sovereign immunity),[21] the judgment is now final, and that HHSC cannot raise immunity in the lower courts as a bar to enforcement of the supreme court's judgment. *See Dearing*, 240 S.W.3d at 347-48 (explaining law-of-the-case doctrine). However, for reasons previously stated, we cannot conclude that the supreme court rendered a judgment awarding relief that would implicate HHSC's sovereign immunity.

---

[20] *City of Galveston v. State*, 217 S.W.3d 466, 468 (Tex. 2007); *see also Texas Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999) (per curiam) ("Since as early as 1847, the law in Texas has been that absent the state's consent to suit, a trial court lacks subject matter jurisdiction."); *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993) (subject-matter jurisdiction may be raised for the first time on appeal and cannot be waived).

[21] *See Madeksho v. Abraham, Watkins, Nichols & Friend*, 112 S.W.3d 679, 683 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (en banc) (plurality op.) ("jurisdiction is an issue in all cases whether explicitly mentioned or not").

In sum, we agree with HHSC that in awarding injunctive relief addressed to the calculation of Medicaid reimbursement rates applicable between FY 2002 through 2007, the district court awarded additional, retroactive relief that was neither explicit nor implicit in the supreme court's judgment. However, as to the portion of the district court's injunction that applied to calculation of reimbursement rates in FY 2008, we conclude that the relief tracked the legal effect of the supreme court's judgment.

**Additional relief**

HHSC next asserts that the district court erred in awarding the additional relief concerning FY 2002-07. It asserts that the additional relief is, among other things, barred by sovereign immunity and runs afoul of the limitations of Former Rule § 355.8063. For the reasons we have already explained in addressing the legal effect of the supreme court's judgment, we agree. Accordingly, we will vacate that portion of the district court's injunction that applies to the calculation of rates for FY 2002 through 2007.

**Injunction violations**

Finally, during the pendency of this appeal, the Hospitals have urged us to exercise our "supervisory power" to remedy what they contend is HHSC's violation of the supreme court's injunction (even if viewed as operating only as to the reimbursement rates applicable from date of mandate forward) by continuing to pay reimbursement under the preexisting rates. We first observe that this request is moot with respect to the nine appellees whose reimbursement rates were determined to be unchanged by the 2010 administrative recalculations. As for the other five appellees, by the time of their request, HHSC had already agreed to recalculate the applicable

reimbursement rates in accordance with the supreme court's judgment, although the adjusted rates were not implemented until FY 2010. Consequently, to the extent these appellees are requesting us to exercise contempt power to coerce compliance with the injunction going forward, the request is moot. The same is true with regard to whether we can coerce HHSC's compliance during FY 2008 and 2009. *See Green v. Mansour*, 474 U.S. 64, 71-73 (1985) (recognizing, in the context of an Eleventh Amendment immunity claim where there was no ongoing violation to enjoin, that courts could order prospective relief, including ancillary measures to appropriate prospective relief, but could not award money damages or restitution, despite a "dispute about the lawfulness of [state actor's] past actions"). We express no opinion as to whether these appellants would possess any other remedy with respect to FY 2008 or 2009, as that question is not before us.

## CONCLUSION

We reverse and vacate the portion of the district court's injunction that enjoins HHSC "from applying the February 28 cutoff/deadline on Plaintiffs' base year claims data used to calculate Plaintiffs' Medicaid Standard Dollar Amounts for state fiscal years 2002 through 200[7]." We otherwise overrule HHSC's contentions and affirm the judgment.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop;
    Justice Waldrop not participating

Reversed and Vacated in part; Affirmed in part

Filed:   August 4, 2011